**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 3:22-CR-30094-NJR** |
| **ALVIN BOATRIGHT,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

DEA Task Force Officer Kyle Waddington's single focus is to interdict drug traffickers. As part of that focus, Waddington targets high-end rental vehicles, SUVs, and vehicles with out-of-state license plates because they could be trafficking drugs across the country and have bigger hiding spots to do so. To identify rentals, Waddington looks for bar codes on the lower portion of the driver's side window.

On August 1, 2022, while watching eastbound traffic in the emergency turn-around-lane on Interstate 70 in southern Illinois, Waddington observed a Lexus SUV with a bar code on the lower right portion of the driver's side window and saw the driver holding a cellphone. The bar code piqued Waddington's interest because he considered the Lexus SUV a high-end rental. Waddington believed the driver holding a cellphone was a sufficient basis to stop the Lexus. As a result, Waddington pulled out after the Lexus and noticed its out-of-state license plate. Waddington ran the plate confirming it was rental. He continued following the Lexus and testified he saw the Lexus speeding and committing a lane violation.

Waddington stopped Alvin Boatright ("Boatright"), the driver of the Lexus. During

the stop, Waddington questioned Boatright about his travel plans, employment, and criminal history. Within seven minutes, Waddington suspected that Boatright possessed drugs. Waddington extended the stop for a K-9 unit to investigate. After the K-9 gave a positive alert, DEA officers searched the Lexus on the roadway for over 40 minutes—but did not find drugs or anything illegal. They searched again at the DEA's Fairview Heights Office and uncovered 1.2 kilograms of cocaine in the Lexus.

The Government relied on Waddington's account to charge the driver of the Lexus with possession with intent to distribute controlled substances containing a detectable amount of cocaine in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B)(ii). Boatright challenges Waddington's actions arguing that the stop was unlawful and seeks "to suppress all evidence that was the fruit of the unlawful August 1, 2022 stop, including the drugs that are the subject of the charge, herein, and any subsequent statements made by [ ] Boatright." (Doc. 32, p. 12).

The Government argues that the stop, Boatright's continued detention, and the search were lawful. Boatright disputes Waddington's version of the facts, and the dashcam video and audio reveal significant differences between Waddington's observations and what transpired. To resolve the factual disputes, the Court held an evidentiary hearing on February 23, 2023, and February 28, 2023. *See United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011) ("[d]istrict courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion"). After the hearing, counsel filed supplemental briefs. (Docs. 47, 53, 55).

B<small>ACKGROUND</small>

## I.      Waddington's Testimony

### A. *Waddington's Employment*

Waddington has been a police officer in Monroe County, Illinois, for about 12 years. (Doc. 43, p. 6). Since 2016, he has primarily worked for the DEA performing highway interdiction, which Waddington describes as "do[ing] high volume traffic stops across the interstate attempting to dismantle drug trafficking organizations." (*Id*.). Waddington estimated that he has been in approximately 100 narcotics investigations. (*Id*. at p. 7). From his experiences, Waddington makes sure to wear a body mic and looks over his report prior to submitting it. (*Id*. at p. 10).

Performing traffic stops is an investigative tool Waddington utilizes to "dismantle drug trafficking organizations." (Doc. 44, pp. 5-7). Waddington never gives traffic tickets. (*Id*. at p. 7). Instead, Waddington only gives verbal warnings. To issue a verbal warning, Waddington must complete a registration check, driver's license check, criminal history check, warrant check, an Illinois Department of Transportation Stop Card ("Stop Card"), and "do the traffic stop." (Doc. 43, pp. 35-36). For both the driver's license and criminal history checks, Waddington must manually type in the driver's last name, first name, middle name, and birth date. (*Id*. at pp. 40-44). For the Stop Card, Waddington must log into a portal and enter in the driver's name, date of birth, race, duration of stop, vehicle information, the reason for the stop, and location of the stop. (*Id*. at p. 49). When there are no complications—no warrants, no criminal history concerns, a valid driver's license, valid registration—it takes Waddington seven to eight minutes to issue a verbal warning. (*Id*. at p. 36).

As just mentioned, Waddington targets high-end rentals because they could be

traveling interstate and used for trafficking drugs. (*Id.*). Waddington also targets SUVs or larger vehicles because they have bigger hiding spots. (*Id.*). And out-of-state plates pique Waddington's interest. (Doc. 43, p. 96, Doc. 44, pp. 5-6).

Waddington's purpose is to "[g]o beyond the scope of the traffic stop, beyond the ticket." (Doc. 44, p. 7). In other words, his goal is to get probable cause to search vehicles that pique his interest. (*Id.* at p. 36).

B. *Waddington's Basis to Initiate the Stop*

On August 1, 2022, Waddington was watching eastbound traffic in the emergency turn around lane at mile maker 16 on Interstate 70. (Doc. 43, pp. 14-15, 83-84). He was in an unmarked Chevy Tahoe. (*Id.* at p. 15). As the Lexus passed Waddington's stopped vehicle, he noticed a bar code on the driver's window and Boatright having a conversation on a cellphone. (*Id.* at pp. 19, 86, 95-96). The cellphone was in Boatright's right hand and draped over his left shoulder. (*Id.* at pp. 20, 85-86).

Waddington pulled out after the Lexus and followed it for nearly eight miles. For the first five miles, Waddington did not activate the dashcam, but ran the plates of the Lexus and found out it was being rented by Boatright. (*Id.* at pp. 89-90; Doc. 44, p. 23).[1] By 11:43:56 a.m., Waddington turned on the dashcam. (Doc. 43, p. 107). When the dashcam was activated, Waddington's Tahoe was approximately 20 feet behind Boatright's Lexus. (*Id.* at p. 112).

Waddington decided to pace the Lexus to determine its speed.[2] Waddington started pacing Boatright at 49 seconds into the dashcam video. (*Id.* at pp. 107-108). Waddington

---

[1] Waddington first testified that he was not gathering information about the Lexus during the first five miles of following. (*Id.* at p. 90).

[2] Waddington paced the Lexus because he was unfamiliar with the vehicle's radar unit. (*Id.* at p. 21).

believed the Lexus was going approximately 75 miles per hour ("mph") in a 70 mph zone based on how fast Waddington's vehicle was going. (*Id*. at 24). Besides speeding and the driver holding a cellphone, Waddington noticed a turn signal violation. (*Id*.).

C. *The Stop*

Waddington stopped the Lexus at mile maker 23.8 on I-70. (*Id*. at pp. 25-27). Waddington parked behind the Lexus. He exited his patrol vehicle and approached the Lexus's passenger side. (*Id*.).

Waddington did not smell cannabis or roaches. (Doc. 44, pp. 23-24). He did not pat Boatright down. (*Id*. at 25). He did not identify himself. (Doc. 43, p. 28). Instead, Waddington asked Boatright if he was aware of the reason for the stop. (*Id*.). Boatright responded, "I know I wasn't speeding," or something like that. (*Id*.). Waddington informed Boatright that he was speeding and "advised him the State of Illinois is hands-free and he cannot be on his cell phone[.]" (*Id*.). Waddington did not mention anything about a lane change. (*Id*. at p. 99). Waddington explained to Boatright that he was going to receive a warning and asked for Boatright's driver's license. (*Id*. at p. 29).

During this initial meeting with Boatright, Waddington spent half his time poking his head in the window of the passenger seat both for his safety and to gather more evidence. (*Id*. at p. 132, Doc. 44, p. 21). Boatright was visibly shaking when handing over his California driver's license. The California license "piqued" Waddington's interest because California is a high drug area. (Doc. 43, pp. 29-30). After receiving Boatright's license, Waddington asked about the Lexus. Boatright explained it was a rental and provided the rental agreement. (*Id*. at pp. 32-33). As Waddington was leaning into the passenger side window, he observed three

cell phones, an open lunch pail box with numerous energy drinks inside,[3] and numerous phone chargers scattered throughout the front interior. (*Id*.). Waddington also was able to see into the rear seat of the Lexus and did not see any luggage. (*Id*. at pp. 33-34).

Next, Waddington asked Boatright to exit the Lexus and inquired whether Boatright had a long drive ahead. (*Id*. at p. 34). Boatright answered, "no, not really." (*Id*.). Waddington walked back to his patrol vehicle, and he again observed no luggage in plain view but could not visibly see into the trunk area. (*Id*.). As Boatright headed to the passenger side of Waddington's vehicle, Waddington asked Boatright where he was headed. Boatright answered Pennsylvania. (*Id*. at p. 35). Waddington narrated, "that's a long haul" into his mic. (*Id*.).

"It was a very hot day." (*Id*. at p. 142). Yet, Waddington made Boatright stand on the passenger side of the patrol vehicle while Waddington ran Boatright's information and criminal history. (*Id*. at p. 143). With the passenger window rolled down, Waddington asked about Boatright's travel plans and employment. (*Id*. at p. 37). Waddington thought Boatright's answers were "very odd [after] not seeing any visible luggage, as well as numerous cell phones, numerous energy drinks, as well as on the rental agreement it shows that it was rented on July 28." (*Id*.). Waddington noticed that the Lexus was a round-trip-week-long rental, and the cost of the rental was $588.01. (*Id*. at pp. 38-39). Waddington thought Boatright "was involved in some sort of criminal activity, that he was lying about the purpose of his trip." (*Id*.). During Waddington's questioning, Boatright asked Waddington if he wanted to see his Pennsylvania ID. (*Id*.). Waddington did not let Boatright

---

[3] Later in his testimony, Waddington notes the lunch pail box was closed. (*Id*. at p. 43).

get the ID because Waddington was worried that Boatright could flee or grab a weapon. (*Id*.).

Waddington's criminal history check uncovered 12 aliases for Boatright, his status of being on supervised release for drugs, and no active warrants. (*Id*. at pp. 44-48). LEADs also showed Waddington that Boatright was born in Pennsylvania. (*Id*. at p. 125). Around this time, Waddington asked Boatright whether he was locked up in 2015. (*Id*. at p. 48). Boatright answered, "[n]o, in 2015—I was not locked up in 2015, I was in prison." (*Id*.). Boatright made a comment that he had no warrants and made an "unusual laugh." (*Id*.). Waddington thought it was unusual because they were not talking about anything funny at the time, and it "seemed to be a nervous behavior laugh." (*Id*.).

While the criminal history check was going on, Waddington asked Boatright follow-up questions about his rental agreement. (*Id*. at p. 51). Waddington asked why Boatright chose to drive a rental across the country. Boatright answered that it was cheaper than flying. (*Id*.). But Waddington, who had recently traveled to southern California, thought Boatright's answer was odd. (*Id*. at pp. 51-53). Waddington also thought Boatright's company name, "Big Logistics," was odd "[b]ecause that's not a name of the company, as well as [he] saw on the rental agreement it stated Blew Candle." (*Id*. at p. 54).

Based on Boatright's criminal history, Waddington asked him if there were drugs in the Lexus. (*Id*.). Boatright said there were no drugs, but Waddington still asked for Boatright's consent to search the vehicle. (*Id*. at p. 55). Boatright did not give consent, but Boatright never answered Waddington with a yes or a no—even though Waddington repeated that question numerous times. (*Id*.).

D. *Waddington's Suspicion of Criminal Activity During the Stop*

Ultimately, Waddington decided to detain Boatright "[d]ue to having reasonable

suspicion to believe that he was involved in criminal activity." (*Id*.). Waddington explained

his suspicion was based on the following:

> [N]umerous phones in plain view. As consistent with my training and
> experience as a drug trafficking [sic], like I said, normally they have a drug
> supply phone, drug customer phone, family/friend phone; along with
> numerous energy drinks in the vehicle. It's common for people to get from
> point A to point B and consume energy drinks in the fastest way possible as
> they can; along with the rental agreement and very, very high end rental. It's
> going to be very, very costly to drive from California to Pennsylvania, rather
> than fly; numerous criminal history, numerous aliases. Normally when people
> have numerous aliases they are involved in criminal activity to try to fly under
> the radar who they really are; being on supervised release for a drug charge,
> and it was a federal drug charge.

(*Id*. at p. 56). Waddington also explained in greater detail why Boatright's travel plans and

duration of his trip to Pennsylvania did not make sense. (*Id*.).

After detaining Boatright, Waddington looked for the contact information of a local

K-9 unit. (*Id*. at p. 57). Boatright gave Waddington "ultimatums"—"[s]tating that

[Waddington] could go ahead and search his vehicle; however, he's not giving [him]

permission to search his vehicle, but [he] could go ahead and search his vehicle, and going

back and forth." (*Id*. at p. 59). Waddington called for a K-9 unit two to three minutes later.

(*Id*. at p. 60). He read Boatright his *Miranda* Rights.

While waiting for the K-9 to arrive, Waddington continued asking Boatright about his

travel plans and employment. (*Id*.). Waddington explained that his suspicions of criminal

activity increased during this time because Boatright explained that he worked for Blew

Candle which did not appear to be a big logistics company. (*Id*. at p. 62). Waddington also

noted that Boatright answered it was going to take six hours to get to western Pennsylvania,

when in Waddington's experience it would have taken Boatright at least eight to nine hours

to get to the western part of Pennsylvania. (*Id*. at p. 61).

E. *The K-9 Alert and Roadside Search*

After 15 minutes of waiting for the K-9 to arrive, Waddington asked Troy Police Officer Cody Lucas ("Lucas") to do a sniff with the K-9. (*Id*. at p. 64). Within a couple of minutes, Lucas informed Waddington that the K-9 "alerted." (*Id*.). Waddington advised Lucas to inform Boatright of the positive alert. (*Id*.).

With the K-9's positive alert, Waddington began searching the trunk of the Lexus and found two heavy cardboard boxes. (*Id*. at p. 65). The boxes were sent by "Mr. Yang" from China and marked "ship to Alvin Boatright." (*Id*. at p. 66). Waddington searched inside the boxes where he found thousands of "yellow paper-bag-style bag[s] with a strip down the middle." (*Id*. at p. 67). The bags also had a clown marking and stated "Magic Life" which was consistent with what Waddington had seen for LSD tablets. (*Id*. at p. 68). Based on Waddington's training and experience, he thought the paper bags contained LSD or MDMA. (*Id*.). Waddington asked Boatright about the cardboard boxes. (*Id*. at p. 69). Boatright "said something to the effect that he was taking them to a dispensary out east, which is in Pennsylvania." (*Id*.).

Waddington continued searching the Lexus roadside and found luggage. (*Id*. at p. 69, 127). But the luggage did not dispel Waddington's suspicions. In fact, Waddington did not find the luggage to be of any "evidentiary value." (*Id*. at p. 69).

F. *TruNarc's Negative Test for Narcotics*

Officers, including Waddington, wanted to test the paper bags to confirm if they were LSD or MDMA and waited 30 minutes for the local drug unit to bring TruNarc (a portable drug test analyzer with lab-standard accuracy). (Doc. 44, pp. 66-69). The paper bags tested negative for narcotics. (*Id*. at p. 69). After the negative test result, Waddington was concerned

and unsure what to do. (*Id.* at pp. 71-72).

G. *The Second Search at the Fairview Heights Office*

Despite the paper bag's negative results for drugs, Waddington made the decision to relocate the Lexus for a "more thorough and safer search, as well as [ ] hav[ing] more resources available at [DEA's] office." (*Id.* at pp. 69-70). Boatright was handcuffed, and he and the Lexus were transported to DEA's Fairview Heights office. (*Id.* at p. 71).

At the Fairview Heights office, Waddington found a Home Depot receipt from Los Angeles, California, dated July 30, 2022. (*Id.* at pp. 72-73). The receipt revealed a purchase of flex tape, a heavy-duty closet bracket, and stretch wrap. (*Id.* at p. 72). Based on his training and experience, Waddington explained that those items are typically used by drug traffickers to conceal narcotics. (*Id.*). After finding the Home Depot receipt, DEA Agents went back out to the Lexus, removed the storage dividers, and found 1.2 kilograms of cocaine. (*Id.* at p. 73).

## II.   **Chris Lutz's Testimony**

Chris Lutz ("Lutz") oversees the entire patrol division of the Monroe County Sheriff's Department. (Doc. 43, p. 142). In this role, he oversees equipment in patrol vehicles. (*Id.* at p. 143). One of the pieces of equipment in these vehicles is the Watch Guard System ("WTS"). (*Id.* at p. 144). The WTS is the dashcam system. (*Id.*). WTS consists of video cameras and microphones. (*Id.* at pp. 147-148). The microphones include a cabin microphone and a wireless microphone worn by the officer. (*Id.* at p. 148).

In addition to video and recording capabilities, WTS also "record[s] data such as when the brakes are activated, GPS location, lights, sirens, patrol speed, and then that has a couple of different functions in and of itself." (*Id.*). Waddington's vehicle did not have its radar unit connected to WTS. (*Id.* at p. 152).

Even though patrol speed data was not being displayed in the dashcam, GPS speed was still being recorded as part of the software package. (*Id*.). Lutz went through Exhibits 11, 12, and 13 to show the GPS speed at different points in Waddington's dashcam recording. (*Id*. at p. 153-159). The data was based on the patrol vehicle's GPS—not radar used on Boatright's vehicle. (*Id*. at p. 172). Lutz had no knowledge of how GPS speed was calculated. (*Id*.). But Lutz uses GPS data in his career and believes it is accurate and reliable. (*Id*. at pp. 161-162).

Besides WTS, Lutz discussed speedometers in patrol vehicles. Speedometers in patrol vehicles are not part of routine maintenance. (*Id*. at p. 163). Lutz could not think of an instance where a speedometer needed to be repaired. (*Id*. at p. 164). Instead, Lutz relies on manufacturers to calibrate the speedometer in patrol vehicles. (*Id*.).

Lutz would have been able to use the radar in Waddington's vehicle on August 1, 2022. (*Id*. at p. 168). Lutz assumed that anybody with training from the police academy would be able to use the radar, but then walked back the comment by explaining that "it would depend on what—I can't testify to somebody else's training." (*Id*. at p. 173).

### III.   Cody Lucas's Testimony

Lucas has been employed with the Troy Police Department for five years. (*Id*. at p. 179). He currently is a patrol officer and a K-9 officer. (*Id*.). He has been a K-9 officer for over a year. To become a K-9 officer, Lucas completed a certification process by attending a four-week academy. (*Id*.). At the academy, Lucas met his K-9 partner. (*Id*. at p. 180).

The K-9 is trained to alert the presence of cocaine, methamphetamine, heroin, and their derivatives. (*Id*. at p. 186). The K-9 is not trained on PCP, LSD, or acid. (*Id*. at 195). Thus, if a vehicle is filled with these drugs, the K-9 would not give a positive alert. (*Id*.). The K-9

would alert, however, if there is ecstasy or MDMA because they are close enough to methamphetamine. (*Id.*).

By August 1, 2022, Lucas had been working with the K-9 for about ten months. (*Id.* at p. 187). When Lucas got on the scene, there were three other officers present. (*Id.* at p. 189). Lucas went around the Lexus with the K-9. (*Id.* at p. 191). Lucas noted that it took the K-9 "a little bit to come to the actual indication itself." (*Id.* at p. 193). Lucas guessed that the delay of the positive alert was in response to a smaller amount or a residual odor. (*Id.* at pp. 201-02). Lucas explained to Boatright that the K-9 made a positive indication and asked Boatright whether there was a small amount of drugs in the Lexus. Boatright denied having drugs.

## IV.    Waddington's Dashcam and Audio

### A. *Following the Lexus (0:00:00-0:02:08)*

The dashcam begins with Waddington driving eastbound on Interstate 70 in the left lane following the Lexus as it passes three vehicles. (Hrg. Ex. 2, Waddington's Dashcam). When audio begins—30 seconds later—Waddington reports that the Lexus was speeding, and the driver was holding a cellphone. Waddington does mention the turn signal violation.

Around 58 seconds into the dashcam, Waddington's vehicle begins to become even with the Lexus. (*Id.* at 0:00:58). Around one minute and 13 seconds into the dashcam, Waddington notes the Lexus's speed is dropping to about 72 to 73 mph. As soon as Waddington activates his emergency flashers, the Lexus pulls safely onto the shoulder of the highway. (*Id.* at 0:01:53).

### B. *The Stop and Waddington's Inquiries* (0:02:12-0:27:48)

Once both vehicles reach a stop, Waddington exits his vehicle and approaches the front passenger side of the Lexus. (*Id.* at 0:02:12). Waddington leans into the passenger

window and the following exchange takes place:

> **Waddington:** What's up man, hey, are you aware of the reason for the stop?
>
> **Boatright:** Absolutely not, 'cause I definitely wasn't speeding.
>
> **Waddington:** Okay, yeah, you were speeding. You were 75 in a 70, okay? Just make sure you slow it down. I'm not writing you a ticket…
>
> **Boatright:** 75 in a 70?
>
> **Waddington:** Yeah. I'm not writing you a ticket, man, I'm just making sure you were aware. And also whenever you went by earlier, and you had that in your hand. Just making you aware, it's hands free in the State of Illinois, okay?
>
> **Boatright:** It's on speaker though.
>
> **Waddington:** Well, you had it in your hand though, that's what I'm saying. Just making you aware man. I'm not giving you a ticket.

(*Id*.). Waddington asks for Boatright's ID. During this time, Waddington makes small talk noting how hot it was that day and asking about the weather in Los Angeles. Within 50 seconds, Waddington asks about the ownership of the Lexus. (*Id*. at 0:02:55). Boatright answers it is a rental.

Less than a minute after approaching the Lexus, Waddington asks Boatright to accompany him to his vehicle to issue a warning. Before Boatright can get out of the Lexus, Waddington asks him if he has a long drive ahead. Boatright answers "nah not really." (*Id*. at 0:03:16).

As Waddington heads back to his patrol vehicle, he attempts to look into the vehicle and notes "multiple cell phones throughout the vehicle." (*Id*. at 0:03:18). Waddington waits for Boatright to exit the Lexus. As Boatright walks to Waddington's vehicle, Waddington asks, "Where you headed to?" and Boatright responds, "Pennsylvania." (*Id*. at 03:03:31). Waddington narrates, "All the way across country driving." (*Id*. at 0:03:35).

Upon immediately entering his patrol vehicle, Waddington immediately starts asking Boatright the following:

**Waddington:** What takes you out there [Pennsylvania], anything good?

**Boatright:** Nah, work's out there.

**Waddington:** Oh okay, what kind of work?

**Boatright:** Computer work.

**Waddington:** Oh nice. You like it?

**Boatright:** It's alright.

**Waddington:** It's a job, right?

**Boatright:** Nah… I mean, you know.

**Waddington:** What part of, uh…

**Boatright:** Computers, that's my main thing, so.

**Waddington:** Oh, do you.

**Boatright:** Yeah.

(*Id*. at 0:03:42-0:04:03).

As Waddington begins typing on his keyboard. He asks the following:

**Waddington:** That's one thing that I'm not good at man, is uhh… computers. What do you do with computers?

**Boatright:** Networking.

**Waddington:** Oh cool. So how long do you have to be out there?

**Boatright:** For a year.

**Waddington:** So, do you live out there?

**Boatright:** Yeah.

> **Waddington:** You do?
>
> **Boatright:** Mhm. I live out there and California.
>
> **Waddington:** Oh.
>
> **Boatright:** You wanna see my Pennsylvania ID?
>
> **Waddington:** That's just a long drive to be driving all the time. You can't fly?
>
> **Boatright:** No, it's not the same. Flying cost more nowadays.
>
> **Waddington:** Oh really?
>
> **Boatright:** Yeah.
>
> **Waddington:** How much it cost to, uh, rent this? $588?

(*Id*. at 0:04:03-0:04:36).

Next, Waddington's computer terminal begins "dinging with alerts as information [is] returned from databases . . . ." (*Id*. at 0:04:36; Doc. 33, p. 5). Waddington continues asking Boatright about how often he rents vehicles, whether he likes California or Pennsylvania better, the cost of living in California, and Boatright's employment. (*Id*. at 0:04:37-0:05:03). Boatright answers these questions.

Less than three minutes into the stop, Waddington's computer terminal is dinging again with more alerts from databases. (*Id*. at 0:05:04). Waddington pauses for about ten seconds and then asks the following:

> **Waddington:** When did you leave Cali? It's gotta take you a couple of days, doesn't it?
>
> **Boatright:** Yeah, I left Cali on Saturday.
>
> **Waddington:** Oh really?
>
> **Boatright:** Yeah.

> **Waddington:** Yeah, I just got back from Cali.
>
> **Boatright:** Oh really, what part?
>
> **Waddington:** Like Long Beach.

(*Id.* at 0:05:06-0:05:30). Thirty seconds later, Waddington's phone makes a notification sound. (*Id.* at 0:05:31). Waddington says, "So let's see . . ." (*Id.* at 0:05:36). Waddington takes about ten seconds to review his information, creating small talk to fill the silence. Then Boatright explains that he does not have warrants or anything. (*Id.* at 0:05:48).

Less than four minutes into the stop, Waddington confirms that Boatright has no warrants. Nonetheless, Waddington begins asking Boatright about his criminal history. (*Id.* at 0:05:54-0:06:28). Waddington becomes more accusatory in his interactions with Boatright:

> **Waddington:** So nothing like that today in the vehicle?
>
> **Boatright:** No, of course not.
>
> **Waddington:** You out of that game?
>
> **Boatright:** I been out of that game.
>
> **Waddington:** I'm not concerned with small amounts man, if you got a little bit for personal use of marijuana or cocaine, heroin, meth-as long as you're being honest.
>
> **Boatright:** I don't do none of that officer. I don't drink, smoke weed, none of that.
>
> **Waddington:** None of that?
>
> **Boatright:** No.
>
> **Waddington:** Any large sums of U.S. currency in the vehicle?
>
> **Boatright:** No. I got like a one hundred something dollars in the armrest.

(*Id.* at 0:06:30-0:07:02).

Less than five minutes into the stop, Waddington asks for permission to search the Lexus. (*Id*. at 0:07:04-0:07:11). Boatright answers that he does not have anything, did not do anything, and feels this is being done because he is black. (*Id*. at 0:07:11-0:07:26). Waddington continues asking about Boatright's criminal history and accusing Boatright of having a lot of cocaine back in 2011. (*Id*. at 0:07:32-0:07:53). After Boatright explains that it was a mandatory minimum, Waddington asks for permission to search the Lexus a *second time*. (*Id*. at 0:08:03-0:08:09). To try and get Boatright to comply, Waddington again asserts that he is not concerned with small amounts or personal use. Again, Boatright says he does not have or use drugs. (*Id*. at 0:08:11).

Immediately after asking Boatright for permission to search the Lexus a second time, Waddington asks Boatright for permission to search the Lexus a *third time*. (*Id*. at 0:08:12-0:08:17). Boatright answers, "No sir, I do not want to give you my permission to search the vehicle – I have no drugs." (*Id*. at 0:08:18-0:08:22). Waddington responds that he is going to call for a K-9. (*Id*. at 0:08:23-0:08:24). He explains that Boatright and the Lexus are going to be detained. Within a second, Boatright replies, "Go ahead, you can search it, bro." (*Id*. at 0:08:28). Waddington seeks clarification asking, "So now you're giving me permission to search?" (*Id*. at 0:08:31). Boatright answers, "Yeah, cause you're holding me up, and I don't— I just wanna go. I don't have nothing in the car." (*Id*. at 0:08:34). Waddington tries to clarify that he has permission to search the Lexus, but ultimately Boatright does not give consent. (*Id*. at 0:08:34-0:10:16). As a result, Waddington tells Boatright that he is being detained and reads him his *Miranda* rights. (*Id*. at 0:10:16-0:10:30). Almost four minutes later, Waddington calls for the K-9. (*Id*. at 0:13:50).

While waiting for the K-9, Waddington tries to trip up Boatright's story multiple

times. First, Waddington asks how he is going to get around Philadelphia. (*Id*. at 0:15:00-0:15:06). Boatright correctly notes that he never said he was going to Philadelphia. (*Id*. at 0:15:10).[4] Second, Waddington tries to trip up Boatright by asking what company he works for. (*Id*. at 0:21:09-0:21:14). But Boatright answers Blew Candle, which is consistent with what was listed on the rental agreement. (*Id*. at 0:21:09-0:21:42). Third, Waddington quizzes Boatright on what he does for Blew Candle, but Boatright repeats that he does networking. (*Id*. at 0:23:44-0:23:50). Boatright even tries to explain to Waddington about networking, but Waddington simply replies that he does not know anything about networking or system administration. Fourth, Waddington tries to trip up Boatright by testing when he left California, but Boatright again answers, "Saturday." (*Id*. at 0:26:23-0:26:25).

   *C.  The K-9 Alert (0:27:48-0:32:00)*

   Waddington tells Lucas that Boatright is traveling from California heading to Pennsylvania. (*Id*. at 0:28:00). Waddington continues telling Lucas that Boatright was driving a rental vehicle and "just got popped for eight years of cocaine." (*Id*. at 0:28:00-0:28:12). Lucas walks the K-9 around the vehicle less than three times. (*Id*. at 0:29:33-0:30:12). The K-9 gives a positive alert at the trunk of the Lexus. (*Id*. at 0:30:13).

   After the K-9's positive alert, other DEA officers walk up to the Lexus. (*Id*. at 0:30:45). Waddington repeats Boatright's criminal history. Lucas explains what the K-9 uncovered to Boatright. (*Id*. at 0:31:28-0:31:56). Waddington narrates that for "noting purposes he advised that was a positive alert." (*Id*. at 0:31:57-0:32:00).

---

[4] Waddington also asks how many more hours of driving Boatright has in front of him. (*Id*. at 0:18:16-0:18:19). Boatright answers, "six." (*Id*. at 0:18:20). Waddington asks whether Boatright is going to get a new vehicle or extend the rental when he gets out to Pennsylvania. (*Id*. at 0:19:53-0:20:00). Boatright answers that his plan is to extend the rental until his vehicle is out of the shop. (*Id*. at 0:20:02-0:20:13).

D. *The Roadside Search (0:32:03-1:13:15)*

As Waddington and other DEA officers begin searching the Lexus, Waddington informs them that there are "two cellphones up front." (*Id*. at 0:32:03). As one DEA officer searches the front driver's side of the Lexus, Waddington searches the trunk and finds two boxes from China. (*Id*. at 0:32:04-0:33:50). Waddington first guesses that the boxes contain methamphetamine. (*Id*. at 0:33:45). A different DEA officer guesses that the boxes contain acid. (*Id*. at 0:33:56-0:34:00). Seconds later, Waddington asserts that the boxes contain "ice." (*Id*. at 0:34:00-0:34:07). Waddington asks, "What the hell is this?" (*Id*. at 0:34:17-0:34:19). Waddington asserts that the boxes "have to be something." (*Id*. at 0:34:24).

Waddington walks a small package to Boatright and asks, "What are these going to be?" (*Id*. at 0:34:40). Boatright says he does not know, but he is bringing the package back to somebody. (*Id*. at 0:34:44-0:34:50). Waddington continues to ask other DEA officers, "What is it?" (*Id*. at 0:35:00). Waddington doubles down asserting that it must be something. (*Id*. at 0:35:00-0:35:03). The DEA officers guess that the boxes contain acid. (*Id*. at 0:35:06). Still unsure, Waddington asserts it must be something.

The DEA agents agree to call to get TruNarc, and Waddington puts Boatright in handcuffs. (*Id*. at 0:35:06-0:35:36). Waddington heads back to his patrol vehicle while other DEA agents continue searching the Lexus. While in the patrol vehicle, Waddington makes a call and asks for someone to bring the TruNarc. (*Id*. at 0:37:00-0:37:08). Waddington exits his vehicle and asks Boatright about the boxes. Boatright answers that the boxes came from China, and someone, who works at a dispensary, asked him to bring the boxes. (*Id*. at 0:37:17-0:37:32). Waddington again asks Boatright what is in the boxes. Boatright answers that those bags will be used to hold marijuana. Waddington asks Boatright whether the paper bags will

test positive for acid or meth. (*Id*. at 0:37:45-0:37:53). Boatright denies that they will, noting that he does not touch that stuff. (*Id*. at 0:37:54).

One of the DEA agents asks Waddington whether Boatright had a Bluetooth on him. (*Id*. at 0:37:55-0:38:02). Waddington was unsure. Then as Waddington walks back to the Lexus, a different DEA officer suggests that Boatright has one of his phones on speaker. (*Id*. at 0:38:19-0:38:21). Waddington decides to wait for officers to arrive with Narcan to continue handling the paper bags, and he takes photos of the boxes and the little paper bags. (*Id*. at 0:38:50-0:40:00).

Waddington heads back to his vehicle and has two conversations on his phone. (*Id*. at 0:41:00). During the first call, Waddington explains he has no idea what is in the little paper bags and repeats Boatright's criminal history. (*Id*. at 0:41:19). During the second call, the person on the other line asks Waddington what he has; Waddington admits, "Honestly, I have no idea." (*Id*. at 0:41:59-0:42:04). Waddington explains the situation noting the following:

- a black male from Los Angeles, California;

- Boatright has done eight years for cocaine and has other recent criminal history as early as February;

- Boatright was driving a rental;

- Boatright was headed to Pittsburg, Pennsylvania;

- Boatright works for a company called Blew Candle;

- Boatright is going out to live in Pennsylvania for a year;

- Boatright is going to get a different rental when he gets to Pennsylvania;

- There was a K-9 alert;

- There was a duffle bag in the trunk along with two boxes from China;

- The little paper bags have strips on it; and

- Boatright explained that the little paper bags were going to be used to hold marijuana.

(*Id.* at 0:42:04-0:43:07). The person on the other line guesses that the little paper bags could contain PCP. (*Id.* at 0:43:08-0:43:12). While Waddington is making these calls, DEA officers are still searching the Lexus, getting down on their knees to search the Lexus's passenger and driver's side floors. (*Id.* at 0:45:00-0:49:40).

Next, Waddington goes back out to the Lexus, takes more photos of the little paper bags, and heads back to his patrol vehicle. (*Id.* at 0:46:00). Waddington sends those pictures to other officers. During one of his calls, Waddington mentions officers finding bank bands up in the front of the vehicle. (*Id.* at 0:48:50-0:49:00). Waddington next asserts, "Obviously, I think it is worth TruNarcing this, don't you think?" (*Id.* at 0:49:04-0:49:10). Waddington again admits that he has never seen anything like it. (*Id.* at 0:49:11-0:49:14). While Waddington is talking to this person, he exits the vehicle again and takes more pictures of the little paper bags. (*Id.* at 0:50:31-0:50:55). Waddington sends the photos, gets back into the patrol vehicle, and asks the person on the phone:

What are your thoughts after they come out here and if it doesn't yield positive—I mean—do we wanna talk to him at all—I mean—or what's your thoughts?

(*Id.* at 0:52:17-0:52:28). Again, Waddington voices that he has never seen anything like this. (*Id.* at 0:53:21-0:53:24). Waddington explains that the DEA officers have not really touched the trunk area at that time because they were waiting on the TruNarc to get there. (*Id.* at 0:54:11-0:54:23).

Waddington approaches Boatright and asks what the little paper bags will test

positive for. (0:56:14-0:56:23). Again, Boatright answers that the little paper bags should not test positive for anything. Waddington tries to tie up Boatright's story about getting the boxes. (*Id.* at 0:56:27-0:57:33). Waddington continues accusing Boatright of getting popped with large sums of cash from Ohio. (*Id.* at 0:57:34-0:58:00).

Waddington heads back to the Lexus and rifles through Boatright's duffle bag. (*Id.* at 0:58:04-0:58:30). Waddington moves one of the boxes off the Lexus and looks at the paper bags in the sunlight. Then he asks Lucas if they have a PCP kit. (*Id.* at 0:58:50-0:59:00).

Waddington reapproaches the Lexus. He searches the trunk by removing both boxes and a package of water and lifting up floor mats. (*Id.* at 0:59:10-0:59:50). After not finding anything, he heads back to his patrol vehicle to make more calls. (*Id.* at 1:00:51).

While Waddington is in his vehicle, another DEA officer searches one of the boxes and notes that the paper bags say, "Magic Life." (*Id.* at 1:01:39-1:01:59). Again, Waddington asserts that the paper bags contain PCP. Waddington calls someone and explains that he did not check where the spare tire was but checked all around—and there was nothing. (*Id.* at 1:03:07-1:03:20).

The other DEA officers search the trunk of the Lexus. (*Id.* at 1:04:45-1:06:20). While they search the trunk, Waddington hypothesizes with Lucas about what they think is in the boxes and little paper bags. The DEA officers walk back to the passenger side of Waddington's patrol vehicle to talk with Waddington about the boxes and the little paper bags. During the conversation, Waddington asks, "Don't you think that's it? Right there?" (*Id.* at 1:08:20-1:08:30). Referring to the little paper bags, Waddington says, "And so if I would have to guess, one strip is probably two doses and you cut it in half and that's why it looks like that." (*Id.* at 1:08:30-1:08:40). Again, Waddington says he has never seen anything like

this. (*Id*. at 1:09:11-1:09:15). The group asserts that Boatright wants to play games. Waddington notes that Boatright talked okay and recounted his conversations with Boatright, his criminal history, and his aliases. (*Id*. at 1:09:29-1:12:30).

E.   *TruNarc's Negative Test for Narcotics (1:13:15-1:21:40)*

Waddington explains to the TruNarc officers that he does not believe the little bags will test positive unless they get the paper bags wet. (*Id*. at 1:13:30-1:13:43). Waddington asserts that it is going to be LSD. (*Id*.). Waddington repeats to the TruNarc officers his conversations with Boatright, his criminal history, and what has occurred so far. (*Id*. at 1:14:00-1:15:34).

One TruNarc officer heads to the trunk of the Lexus and tests the little paper bags. (*Id*. at 1:15:34-1:19:00). While waiting, Waddington says that they had a couple of busts recently. Waddington first thought this was going to be a "money load." (*Id*. at 1:16:40-1:17:00). The TruNarc officer comes back to Waddington and explains that the tests were inconclusive. (*Id*. at 1:19:11-1:1914). Despite the inconclusive tests, Waddington says, "we're still going to take it up there—and talk to him especially with his history and what not." (*Id*. at 1:20:10-1:20:18).

**V.   Lucas's Dashcam and Audio**

Lucas's dashcam is consistent with Waddington's dashcam—except for one item. Around 26 minutes into Lucas's cam video, Lucas recalls how the previous night the K-9 gave a positive alert on the back of a different vehicle. When they searched that vehicle, they found 15 pounds of marijuana in a suitcase. Lucas explains that his K-9 is not trained on marijuana. As a result, the officers took the suitcase out of the vehicle; the K-9 had "zero interest" in it. Then the officers focused on the trunk of the vehicle noticing it was "trapped." Lucas states that this vehicle came from California, like Boatright.

DISCUSSION

**I.      Lawful Basis to Initiate the Traffic Stop**

"Because traffic stops are typically brief detentions, more akin to *Terry* stops than formal arrests, they require only reasonable suspicion of a traffic violation—not probable cause." *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (citations omitted). The question is whether an officer "reasonably believed that he saw a traffic violation, not whether [an] [individual] actually violated the statute." *Id*. at 428 (citing *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005); *United States v. Simon*, 937 F.3d 820, 829 (7th Cir. 2019)).

*A.  Did Waddington Reasonably Believe He Saw a Turn Signal Violation?*

There is dashcam evidence "show[ing] [at] 11:44:31, the right turn signal of the white Lexus SUV illuminated and blinked once before the Defendant's vehicle began moving from the left (passing) lane to the right lane in front of the red convertible." (Doc. 33, p. 2). The problem is the dashcam shows that Waddington did not believe—and thus he could not have *reasonably believed*—that Boatright failed to provide 200 feet notice with his turn signal prior to switching lanes.

At 33 seconds into the dashcam, Waddington's audio clicks on, and he reports the Lexus speeding and a cellphone in the driver's hand. Waddington specifically notes "two violations"—not a third violation—even though the dashcam shows the potential violation occurring seconds earlier. If Waddington reasonably believed he saw Boatright failing to provide 200 feet notice with his turn signal prior to switching lanes, then he would have mentioned this as the third violation.

Additionally, in the dashcam, Waddington only told Boatright that the reason for the stop was speeding and seeing Boatright holding a cellphone. (Hrg. Ex. 2, Waddington's

Dashcam, 0:02:18-0:02:39). The dashcam forecloses the turn signal violation as a lawful basis for initiating the traffic stop—and most importantly, it brings into question Waddington's credibility.

B. *Did Waddington Reasonably Believe He Saw a Cellphone Violation?*

The dashcam shows Waddington first reporting that Boatright "had a cellphone in his hand earlier." (*Id.* at 0:00:46). Waddington then says it appears that Boatright "is still holding [the] [cellphone] up to the left." (*Id.* at 0:00:58). When Waddington pulled Boatright over, he explained what he thought the cellphone violation to be by noting that "whenever [Boatright] went by earlier, and [he] had [the] [cellphone] in [his] hand." (Doc. 33, p. 3). Waddington then states, "[j]ust making you aware, it's hands free in the State of Illinois, okay?" (*Id.*). Waddington never states that he saw Boatright talking on the cellphone, watching a video, or texting.

The significance of the dashcam and Waddington merely reporting that Boatright was holding a cellphone is that under Illinois law, "[a] person may not operate a motor vehicle on a roadway while *using* an electronic communication device, including *using* an electronic communication device to watch or stream video." 625 ILL. COMP. STAT. 5/12-610.2 (emphasis added). The law also has exceptions including, "a driver using an electronic communication device in hands-free *or* voice-operated mode, which may include the use of a headset." *Id.* (emphasis added). A driver does not violate the law by simply holding a cellphone in his hand.

Indeed, Waddington must have reasonably believed that he observed Boatright *using* the cellphone. *See e.g., People v. Buckley*, 2022 IL App (1st) 191391-U, ¶ 56 (Ill. App. Ct. 2022) ("[officer's] testimony that he observed the defendant holding the phone in his hand *while*

*speaking into it*, was sufficient evidence of improper 'use' of the cell phone while driving to justify the stop") (emphasis added); *People v. Allen*, 2017 IL App (4th) 150408-U, ¶¶ 60-61 (Ill. App. Ct. 2017) (because the "driver of the Tahoe had been holding a cell phone *to his ear* while driving" the court held that "[a] reasonably cautious police officer, experiencing those facts, would, first of all, regard the traffic stop as lawful") (emphasis added); *United States v. Paniagua-Garcia*, 813 F.3d 1013, 1015 (7th Cir. 2016) (noting that under Illinois's "hands-free" law, "a driver is forbidden to *use a cellphone with his hands*, as distinct from using bluetooth or other technologies that enable the driver to communicate without *manipulating* his cellphone") (emphasis added). The Court does not find that Waddington reasonably believed he observed a cellphone violation because Waddington reported a cellphone violation occurred when he merely saw Boatright holding a cellphone.[5]

At the hearing, Waddington's testimony added a significant fact: Boatright appeared to be having a conversation. (Doc. 43, pp. 95-96). The Court finds Waddington's testimony regarding this additional fact to lack credibility, however, because Waddington only reported that he saw Boatright holding a cellphone in the dashcam recording.[6]

C. *Did Waddington Reasonably Believe He Saw a Speeding Violation?*

At 32 seconds into the dashcam recording, Waddington notes that the Lexus was speeding. But the dashcam does not show Waddington pacing the Lexus when he makes that assertion. So the reasonable inference is that Waddington must have conducted the pacing

---

[5] Further, the Court finds that Waddington made an unreasonable mistake of law, and thus the stop was still invalid under *Heien v. North Carolina*, 574 U.S. 54 (2014). Here, the statutory language is unambiguous.

[6] Boatright admitting that the cellphone was on speaker is immaterial. First, Boatright made that comment *after* Waddington initiated the traffic stop. Second, the lawfulness of the traffic stop is not based on what happened but is based on an officer's reasonable belief of what he or she observed. Again, Waddington merely saw Boatright holding a cellphone—not Boatright using the cellphone.

method *before* the dashcam video was activated to be able to assert that the Lexus was speeding at the 32 second mark. And, at the hearing, Waddington confirmed that he did not start pacing the Lexus until 49 seconds into the dashcam recording. (Doc. 43, pp. 107-109). Thus, Waddington's assertion of the Lexus speeding at the 32 second mark was not based on radar or the pacing method.

The pacing method that takes place around the 49 second mark in the dashcam recording does not show the patrol vehicle's speed. To overcome this problem, the Government had Lutz testify that *GPS speed* was recorded, but it is only available to be reviewed from the administrator's panel on the program that collects and assembles the dashcam footage. (*Id.* at pp. 153-159). Lutz then went through Exhibits 11, 12, and 13 to show the GPS speed at different points in the dashcam recording. (*Id.* at pp. 157-163). The problem is GPS speed is based on the patrol vehicle—not radar used on Boatright's vehicle. (*Id.* at pp. 176-177). Another problem is Lutz had no knowledge of how GPS speed was calculated. (*Id.* at p. 177). Lutz's testimony does not resolve the fact that the dashcam does not show the patrol vehicle's speed.

Additionally, officers cannot create a situation which causes a driver to react appropriately. *See e.g., United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1124 (9th Cir. 2002) ("[c]ertainly, an agent cannot create a situation which amounts to a dangerous driving condition, observe the driver react appropriately, and then base reasonable suspicion on the reaction because it somewhat comports with 'suspicious behavior'"). Again, Waddington's *unmarked* Chevy Tahoe followed Boatright's vehicle for five miles. Then Waddington tailgated Boatright's vehicle while three other vehicles were in the right lane. (Doc. 43, p. 107). With vehicles traveling in the right lane—and a large SUV less than 20 feet behind him—

Boatright accelerated past the vehicles in the right lanes and quickly changed lanes to get out of the *unmarked* Chevy Tahoe's way. Thus, by the time Waddington attempts to start pacing, Boatright may have been traveling faster than 70 mph, but it was because of the situation created by Waddington's actions.

Setting aside Waddington's actions, Waddington's testimony regarding the pacing that took place around the 49 second mark or earlier further lacks credibility because Waddington had to catch up with Boatright to get even with the Lexus, which Waddington conceded required him going faster than Boatright. (*Id*. at pp. 111-112). For all these reasons, the Court does not find that Waddington reasonably believed that he saw a speeding violation.

## II. Lawful Basis to Prolong the Stop

Even if Waddington reasonably believed that he saw one or more traffic violations, Boatright argues that "the stop became illegal when law enforcement unlawfully extended the stop." (Doc. 32, p. 7). The Court agrees.

"[T]raffic stops must remain limited in scope: 'A seizure for a traffic violation justifies a police investigation of that violation.'" *Cole*, 21 F.4th at 427-28 (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). "Police may not 'detour[ ]' from that 'mission' to investigate other criminal activity. *Id*. at 428 (quoting *Rodriguez*, 575 U.S. at 356–57). "A detour that 'prolongs the stop' violates the Fourth Amendment unless the officer has reasonable suspicion of other criminal activity to independently justify prolonging the stop." *Id*. (quoting *Rodriguez*, 575 U.S. at 355).

When determining the tolerable duration of police inquiries during a traffic stop, courts must analyze the seizure's mission. *See Rodriguez*, 575 U.S. at 354 (holding that "the

tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'"). "The mission of a traffic stop, in turn, is 'to address the traffic violation that warranted the stop and attend to related safety concerns.'" *Cole*, 21 F.4th at 428 (quoting *Rodriquez*, 575 U.S. at 354.) "Tasks within that mission include 'determining whether to issue a traffic ticket' and pursuing 'ordinary inquiries incident to [the traffic] stop.'" *Id.* (quoting *Rodriquez*, 575 U.S. at 355). "Typically, the ordinary inquiries incident to a traffic stop 'involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.'" *Id.* (quoting *Rodriquez*, 575 U.S. at 355). "Such inquiries fall within the mission of a stop because they 'serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.'" *Id.* at 428-29 (quoting *Rodriquez*, 575 U.S. at 355).

"Officers may, though, investigate unrelated matters that do not prolong the stop 'beyond the time reasonably required to complete th[e] mission.'" *United States v. Goodwill*, 24 F.4th 612, 616 (7th Cir. 2022) (quoting *Rodriguez*, 575 U.S. at 354–55). "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). "While officers must act diligently, [the] [Seventh] [Circuit] [has] repeatedly [ ] declined to adopt even a rule of thumb that relies on the number of minutes any given stop lasts." *United States v. Gholston*, 1 F.4th 492, 496 (7th Cir. 2021).

Waddington knew that the Lexus was a rental while he was following Boatright for the first five miles. (Doc. 43, pp. 94-97). After approaching the Lexus and talking briefly to Boatright, Waddington decided he was only issuing a warning. Then Waddington received

Boatright's valid rental agreement and driver's license. Upon receiving this documentation, Waddington asked Boatright to go with him to his patrol vehicle so Waddington could issue him a warning. (Hrg. Ex. 2, Waddington's Dashcam, 0:03:11).

Boatright contends Waddington's inquiries after he and Waddington went to the patrol vehicle unlawfully prolonged the stop. To determine whether Waddington unlawfully prolong the stop, the Court must determine whether (1) Waddington's inquiries fell outside the mission of the stop; (2) his actions added time to the stop; and (3) Waddington had reasonable suspicion. *Cole*, 21 F.4th 421.

*A. Were Waddington's Inquiries Outside the Mission of the Stop?*

"[T]ravel-plan questions ordinarily fall within the mission of a traffic stop." *Cole*, 21 F.4th at 429. "This does not mean, however, that officers have a free pass to ask travel-plan questions until they are subjectively satisfied with the answers." *Id*. at 430. "An officer's travel-plan questions, like the officer's other actions during the stop, must remain reasonable, and reasonableness is an objective standard based on all the circumstances." *Id*.

When an officer's questions are closely related to a discrepancy between a defendant's license and registration, "[the] travel-plan questions during the initial roadside detention [will] [fall] within the mission of the traffic stop and [will] not unlawfully prolong the traffic stop." *Cole*, 21 F.4th at 432. In *Cole*, a sheriff was on criminal interdiction patrol when he spotted a Volkswagen traveling east on Interstate 55. *Id*. at 425. The Volkswagen was traveling 10 to 15 miles below the posted speed limit, and the car's rear cargo area was covered. *Id*. An Illinois State Police Trooper ("Trooper") was doing criminal interdiction patrol further east on the interstate. The sheriff messaged the Trooper about the Volkswagen's suspicious activity and the results of a license plate check. *Id*. The license plate

check revealed that the defendant—who had an address in Los Angeles, California—recently purchased the vehicle and only insured the vehicle four days earlier. *Id*. Ultimately, the Trooper pulled the Volkswagen over for following too closely, in violation of 625 ILCS 5/11-710(a).

The Trooper in *Cole* approached the Volkswagen and asked for license and registration. The defendant produced an Arizona driver's license and a California registration. *Id*. The Trooper then asked the defendant to follow him to his vehicle to explain the purpose of the stop. *Id*. at 426. During this initial conversation, the Trooper saw numerous drinks, snacks, and only a small backpack in the car. *Id*.

In the squad car, the Trooper spent a minute explaining how the defendant followed too closely, but then moved on asking about the Arizona driver's license and California license plate. *Id*. Indeed, "[b]efore inquiring into [defendant's] travel, [the] [Trooper] asked [defendant] about the discrepancy between his Arizona license and California registration." *Id*. at 432. The defendant's response then "referenced three other states beyond Arizona and California." *Id*. The defendant "explained that he was a chef who split his time between Los Angeles, Maryland, and New York, adding that he kept his Arizona license because of the expiration date and that he might be moving to Florida soon." *Id*. "When [the] Trooper [ ] began generally inquiring about [defendant's] travel details, [defendant] added two more states into the mix: He said he had stopped in Cincinnati on his way from Maryland to Colorado." *Id*. "By this point, [the] [defendant] had mentioned seven different states—none of which was Illinois—in response to [the] [Trooper's] questions about his license, registration, and basic trip details." *Id*. The Court noted the following:

Understandably, [the] Trooper [ ] had follow-up questions. [The] [defendant] evaded some of these follow-up questions. After [the] [defendant] volunteered that he worked as a chef, for example, [the] Trooper [ ] asked where he worked. [Defendant] replied with his occupation, saying he was a personal chef. [The] Trooper [ ] tried asking the same question another way: "Who do you work for?" This time, [the] [defendant] responded that he worked for two former professional football players and that "in between" he was a chef. [The] [defendant] similarly evaded [the] [Trooper's] [ ] question about where he began his trip, prompting [the] Trooper [ ] to repeat the question. [The] [defendant's] explanation for where he was currently living was also hard to pin down. Initially, he said he spent most of his time in Los Angeles, while noting that he might be moving to Florida. When [the] Trooper [ ] followed up, however, [the] [defendant] seemed to agree that he was currently living in Maryland. In addition to evading questions, [the] [defendant] gave confusing and improbable answers that prompted other reasonable follow-up questions.

*Id.*

On these facts, the Court held that the Trooper's "travel-plan questions during the initial roadside detention fell within the mission of the traffic stop and did not unlawfully prolong the traffic stop." *Id*. The Court acknowledged that the Trooper had "developed reasonable suspicion of other criminal activity less than nine minutes into the stop, before he told [the] [defendant] he would issue him a warning and before they drove to the gas station." *Id*. at 433. In fact, the Court distinguished this fact to the travel-plan questions that came *after* the traffic stop was completed in *United States v. Gomez-Arzate*, 981 F.3d 832 (10th Cir. 2020).[7] The Court also found that the Trooper's questions about the defendant's basic travel details "were relevant to the traffic violation and roadway safety—and asked reasonable follow-up questions based on [the] [defendant's] elusive answers." *Id*. at 432.

Unlike in *Cole*, where the Trooper's questions were closely related to the discrepancy between the defendant's license and registration, here Waddington's questions "rather reflect

_____

[7] In *Gomez-Arate*, the citation had been written and explained 11 minutes in, but then the officers proceeded asking additional travel-plan questions. *Id*. at 840.

an independent investigation of other criminal activity." *Id*. at 433. Recall in *Cole*, before inquiring into defendant's travel, the Trooper asked the defendant about the discrepancy between his Arizona license and California registration. *Id*. at 432. This inquiry naturally led into the Trooper's travel-plan and employment questions. The Government could argue that Waddington's inquiries were related to the rental agreement. The problem is the rental agreement did not have a discrepancy like the defendant's license and registration in *Cole*.

Additionally, in *Cole*, the defendant volunteered his employment, mentioned seven different states while talking to the Trooper, evaded the Trooper's question about where he began his trip, and the defendant's explanation for where he was currently living was hard to pin down. Here, however, Boatright did not volunteer his employment. When asked where he was headed, he mentioned one state—Pennsylvania. Boatright did not evade Waddington's question about where his trip began—California. Finally, Boatright's current living arrangements were not hard to pin down as he explained that he lived in both Pennsylvania and California.

For these reasons, the Court finds Waddington's inquiries fell outside the mission of the stop and were unreasonable.

*B.  Waddington's Unrelated Inquiries Added Time to the Stop*

Again, the "critical question . . . is not whether the [unrelated inquiry] occurs before or after the officer issues the ticket . . . but whether conducting the [unrelated inquiry] 'prolongs'—i.e., adds time to—'the stop.'" *Rodriguez*, 575 U.S. at 357. Here, Waddington testified that many of his questions were asked while checking Boatright's license, outstanding warrants, and his criminal history. But the dashcam shows Waddington asking these questions *well before* checking for outstanding warrants and Boatright's criminal history.

Indeed, less than four minutes into the stop, Waddington confirmed Boatright had no warrants, but Waddington continued inquiring into Boatright's criminal history. (Hrg. Ex. 2, Waddington's Dashcam, 0:05:54-0:06:28). Then while waiting for the K-9, Waddington unsuccessfully tried to trip up Boatright's story multiple times. (*Id*. at 0:15:00-0:26:25). Even after the officer's unsuccessful roadside search, Waddington never completed the stop—prolonging the stop well over 80 minutes. (Doc. 43, pp. 49-50).

C.   *Reasonable Suspicion to Prolong the Stop to Conduct Unrelated Inquiries*

Waddington needed reasonable suspicion to conduct his unrelated inquiries. "When evaluating reasonable suspicion, courts must consider 'the totality of the circumstances—the whole picture.'" *United States v. Rodriguez-Escalera*, 884 F.3d 661, 668 (7th Cir. 2018) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). "A 'divide-and-conquer analysis' that examines each factor supporting reasonable suspicion in isolation is not permitted." *Id*. (quoting *District of Columbia v. Wesby*, 138 S.Ct. 577, 588 (2018)). "[H]owever, the totality-of-the-circumstances test does not bar courts from discussing factors separately." *Id*. "It simply requires that courts consider the reasonable inferences that a law enforcement officer could draw from the objective facts in combination." *Id*.

The Government notes that Waddington's reasonable suspicion was based on the following specific and articulable facts:

1.   Boatright was nervous, "even after he was informed that he would be receiving a warning for his traffic violations;"

2.   Boatright "supplied illogical and contradictory answers to routine travel-plan questions;"

3.   Boatright "provided inconsistent and evasive answers to general questions;"

4.  Boatright "has a lengthy criminal history, including recent, serious drug distribution charges for which he was on supervised release;" and

5.  Waddington's observations—combined with his training and experience added to suspicions of drug trafficking.

(Doc. 33, pp. 14-19; Doc. 53, pp. 14-19).

Here, the Court finds that Waddington's testimony regarding his observations of a cooler of energy drinks, the lack of luggage, and Boatright appearing nervous lack credibility; these observations will not be part of the Court's evaluation of whether he had reasonable suspicion to extend the traffic stop. *See Rodriguez-Escalera*, 884 F.3d at 669 (acknowledging that the district court is not required to credit law enforcement testimony when the court's review of the video from the traffic stop could lead it to the opposite conclusion). There are numerous inconsistencies between Waddington's testimony and the dashcam. First, in the dashcam, there is no mention of a lunch pail with energy drinks. But during the evidentiary hearing, Waddington testified that he saw a lunch pail with numerous energy drinks. (Doc. 43, p. 33). Second, there is no mention of a lack of luggage until 32 minutes into the dashcam footage. But during the evidentiary hearing, Waddington testified that he observed no luggage in the rear seat when he first engaged with Boatright. Third, there is no mention of Boatright appearing nervous in the dashcam footage. Rather, Waddington notes that Boatright talked "okay." (Hrg. Ex. 2, Waddington's Dashcam, 1:09:25-1:10:40).

The Court also finds the following facts are too broad:

-   Boatright renting a Lexus;

-   Boatright's origin in Los Angeles; and

-   Boatright's travel on Interstate 70.[8]

---

[8] The Seventh Circuit has "remind[ed] the government to refrain from using criteria so broad as to

Accordingly, the following facts govern whether Waddington had reasonable suspicion to detain Boatright:

- Boatright had two cellphones;

- Boatright provided a valid license and rental agreement;

- Boatright answered questions "okay;"

- Waddington did not notice any roaches;

- Waddington did not smell cannabis;

- Boatright had no active warrants;

- Boatright was previously convicted of a cocaine offense; and

- Waddington and Boatright's conversation until the K-9 arrived.

Based on the totality of the circumstances, the Court finds that Waddington lacked reasonable suspicion. Boatright did not provide inconsistent and evasive answers. Waddington even attempted to trip up Boatright, but he was consistent:

- Waddington asked Boatright how he is going to get around Philadelphia, but Boatright noted that he never said he was going to Philadelphia;

- Waddington asked about Boatright's place of employment, but Boatright answered Blew Candle which was consistent with what was listed on the rental agreement;

- Waddington quizzed Boatright on what he does for Blew Candle, but Boatright repeated that he does networking;

---

subject 'a very large category of presumably innocent travelers' to 'virtually random seizures.'" *Cole*, 21 F.4th 421, 435 (7th Cir. 2021) (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980)). In *Cole*, the Court did not consider the following factors:
- Make of defendant's car;
- Defendant's origin in Los Angeles;
- Defendant's travel on Interstate 55; and
- His slow speed and rigid driving posture.
*Id*.

- Waddington tested when Boatright left California, but Boatright again answered "Saturday."

(Hrg. Ex. 2, Waddington's Dashcam, 0:15:00-0:26:25).

As far as Boatright's criminal history, in *United States v. Walton*, 827 F.3d 682 (7th Cir. 2016), the Court noted:

> In *Sanford*, a police officer pulled over a vehicle for speeding and ran a criminal history check on the passengers. *Sanford*, 806 F.3d at 956. The check revealed that one of the passengers had 19 arrests for different offenses, including drug offenses. *Id.* The officer then requested a canine unit and detained the vehicle until it arrived. *Id.* We found that "[t]he criminal histories that [the officer] uncovered in his computer search made a compelling case to wait for the dog—the trooper had *reasonable suspicion of criminal activity at that point* and so was justified in prolonging the stop for a reasonable time to confirm or dispel, with the dog's assistance, his *mounting suspicions*." *Id.* at 959. In this case as well, Walton's extensive criminal history, which included a drug trafficking offense, *further justified extending the traffic stop beyond the point of issuing the written warning, in order to further confirm or dispel Officer McVicker's "mounting" suspicion that the two were involved in criminal activity.*

*Id.* at 688 (emphasis added). Indeed, the officer in *Walton* had *mounting suspicion* of criminal

activity because of the following facts:

- Within three to four minutes of pulling the passengers over, there were two passengers with one bag of luggage in a large Chevrolet Suburban;

- In the officer's experience, criminals often rent large luxury vehicles;

- Renting the large Chevrolet Suburban was excessive for the purpose of driving two people from Colorado to Ohio;

- Prior to issuing the written warning, the Officer discovered that the two individuals were not legally entitled to drive the vehicle;

- By the time the officer issued the warning, he heard conflicting stories from the passengers regarding the amount of time the Kansas police officers had detained them the previous evening and whether the vehicle was searched.

*Id.* at 687-88.

Unlike the officer's mounting suspicion in *Walton*, Waddington lacked mounting

suspicion that Boatright was involved in criminal activity. Within three to four minutes of

pulling Boatright over, Waddington saw two cellphones—that's it. As far as the amount of

luggage in Boatright's vehicle, Waddington found one bag for one traveler. And, unlike the

individuals in *Walton*, Boatright was entitled to drive the car. In summary, while Boatright's

"most recent conviction [was] a 2011 cocaine distribution charge . . .", (Doc. 33, pp. 4-5)—

Waddington needed more. *See e.g., United States v. Lewis*, 920 F.3d 483, 493 (7th Cir. 2019)

(besides defendant's supervised release for a drug offense, defendant was "unusually

nervous" and "his travel explanations seemed suspiciously inconsistent"); *United States v.

Sanford*, 806 F.3d 954, 956-57 (7th Cir. 2015) (besides defendant's "19 arrests for a variety of

offenses including drug offenses, and [ ] the other passenger['s] [ ] [ ] recent arrest for

manufacturing cocaine[,]" the trooper testified that "the occupants were nervous and

evasive, reluctant to speak, and made poor eye contact").[9]

For these reasons, the Court finds Waddington lacked reasonable suspicion to

lawfully extend the stop.

## III.    The Warrantless Search of the Lexus in Fairview Heights

"Warrantless searches are per se unreasonable under the Fourth Amendment, subject

to only certain exceptions." *United States v. Kizart*, 967 F.3d 693, 695 (7th Cir. 2020) (citing

*Arizona v. Gant*, 556 U.S. 332, 338 (2009)). Here, law enforcement "lacked a warrant to search

[Boatright's] car, so the government must show by a preponderance of the evidence that the

search fell within one of the recognized exceptions to the warrant requirement." *United States*

---

[9] In *Sanford*, 806 F.3d at 957, the Court also noted that the trooper obtained additional suspicion when
the "[driver] claimed to have been visiting Sanford's hospitalized grandmother, but also said that she
and her passengers had left Peoria at 6 p.m., which meant that the visit would have been late at night
[ ] [a]nd she couldn't name the hospital."

*v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009) (citations omitted).

The Government relies on the automobile exception, "which allows authorities to search a car without a warrant if they have probable cause." *Kizart*, 967 F.3d at 695 (citations omitted). "Probable cause to search a vehicle exists when, based on the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Sands*, 815 F.3d 1057, 1063 (7th Cir. 2015) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

The Government argues that "[a] positive indication to the odor of narcotics by a trained and certified canine provided probable cause to search [ ] [Boatright's] vehicle." (Doc. 53, p. 19). According to the Government, "[a]fter developing reasonable suspicion to detain [ ] [Boatright] and conduct further investigation, suspicions only deepened, and ripened into [probable] cause to search." (*Id.*). The Government's argument goes as follows:

> In just 90 seconds, K-9 Szoldi provided an unmistakable alert to the presence of a narcotic odor on the bottom left of the seam between the trunk and the bumper. When DEA officers began searching the Defendant's vehicle they located thousands of wax envelopes that they initially believed could contain LSD blotter paper, which also deepened their suspicions. These envelopes were in large boxes addressed to the defendant and mailed from China. Ex. 9. The Defendant also told agents that the boxes were bound for a dispensary, which supplied additional evidence that the Defendant could be involved in drug trafficking. Tr. 295-96. Szoldi's abilities were confirmed later at the DEA office when agents located over a kilo of cocaine in the lower left side of a trunk storage compartment, nearest where Szoldi indicated.

(*Id.* at pp. 19-20).

### A. The Automobile Exception: Immediate or Delayed Search

The Government is correct that "a positive alert by a trained drug dog gives rise to probable cause to search a vehicle." *United States v. Washburn*, 383 F.3d 638, 643 (7th Cir. 2004). The problem is law enforcement "may conduct *either* an immediate *or* a delayed search of the

vehicle." *California v. Acevedo*, 500 U.S. 565, 570 (1991) (citing *Chambers v. Maroney*, 399 U.S. 42, 52 (1970)) (emphasis added).

Here, law enforcement conducted an immediate search of the Lexus on the side of the road. (Hrg. Ex. 2, Waddington's Dashcam, 0:32:03-1:13:15). For over 40 minutes, law enforcement searched the Lexus's front, passenger seats, floorboards, and trunk. The roadside search did not uncover drugs, guns, or a large sum of money. Then law enforcement conducted another delayed search in Fairview Heights without additional probable cause.

    B.   *Even if the Automobile Exception Allows Both an Immediate and a Delayed Search, was Law Enforcement's Additional Search Reasonable Under the Circumstances?*

Waddington insists "[he] can *always* take the vehicle off the road for a more thorough and safe search, which [he] ha[s] done in the past numerous times." (Doc. 44, p. 72) (emphasis added). This is incorrect. Rather, law enforcement can *always* take a vehicle off the road *when* it is reasonable under the circumstances. In *United States v. Ross*, 456 U.S. 798, 807 (1982), the Supreme Court explained its automobile exception jurisprudence and how courts must base their decisions on the practicalities of the situation:

> The Court also has held that if an immediate search on the street is permissible without a warrant, a search soon thereafter at the police station is permissible if the vehicle is impounded. *Chambers*, *supra*; *Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209. These decisions are based on the practicalities of the situations presented and a realistic appraisal of the relatively minor protection that a contrary rule would provide for privacy interests. Given the scope of the initial intrusion caused by a seizure of an automobile-which often could leave the occupants stranded on the highway-the Court rejected an inflexible rule that would force police officers in every case either to post guard at the vehicle while a warrant is obtained or to tow the vehicle itself to the station. Similarly, if an immediate search on the scene could be conducted, but not one at the station if the vehicle is impounded, police often simply would search the vehicle on the street-at no advantage to the occupants, yet possibly at certain cost to the police.

*Id*. at 807.

For example, in *United States v. Barragan*, 88 F. App'x 107 (7th Cir. 2004), the defendant's vehicle was searched three times—"the first of which was justified as a search incident to an arrest and the second as a constitutionally permissible inventory search." *Id*. at 111. After the second search, "[t]he large amount of cash recovered aroused suspicions, prompting the officers to contact the head of the narcotics unit . . . [and] [officers] agreed that the officers should bring in a drug-sniffing dog." *Id*. at 109. After a positive alert at the vehicle's rear by the dog, "[t]he officers focused on that area, lifting out a large stereo speaker box which appeared suspicious for several reasons: It appeared to be homemade out of pressboard; its protruding wires were not connected to anything; its seams were sealed; and the box was remarkably heavier than similar boxes [officers] had encountered in other searches." *Id*. "Suspecting that the speaker box was not genuine, [officers] pried the box apart." *Id*. "Inside was a disassembled machine gun, two handguns, $2,900 cash and a small electronic scale." *Id*.

In *Barragan*, the defendant argued that the third search of the vehicle "violated the Fourth Amendment because it was not supported by probable cause." *Id*. at 111. According to the defendant, "since two previous searched uncovered nothing, the circumstances [ ] [ ] failed to establish probable cause." *Id*. at 112. The Court disagreed, noting that "law enforcement officers, based on their experience, have learned that drug couriers have gone to great lengths to hide drugs in automobiles." *Id*. at 112 (citations omitted). The Court held that "the fact that a superficial search did not turn up anything does not negate the other evidence (especially the alerting by [the] [K-9]) which was more than sufficient to create a fair probability that contraband would be found in the van." *Id*.

The crucial difference is that in *Barragan* officers found the speaker box containing the

evidence of a crime after the positive alert by K-9. The officers then used their experience to further search the speaker box. Unlike the suspicious speaker box, which was identified immediately after the positive alert, the Home Depot receipt was not identified until the second search in Fairview Heights. (Doc. 43, pp. 72-73); (Hrg. Ex. 22, p. 7). Thus, unlike *Barragan*, where officers developed additional suspicion that the defendant was hiding drugs after a K-9 alert, Waddington did not develop the additional suspicion that Boatright was hiding drugs until he found the receipt in Fairview Heights.

Another crucial difference is that in *Barragan* the evidence in support of probable cause included the following:

> . . . the finding of a gun cleaning kit without a gun, and the false statements made by [defendant] as to his identity, as well as the statement [defendant] and [his] [passenger] made that they were headed to Hayward, when they were actually driving in the wrong direction. Their statements about who owned the van were also contradicted by [defendant's] girlfriend. Additionally, officers seized large amounts of currency and discovered outstanding warrants for [defendant], and [a] [trained] [dog] alerted to the presence of drugs.

*Id*. There is no such evidence here. Waddington even admitted he was *unsure* what to do and even questioned whether law enforcement wanted to talk to Boatright at all:

**Q:** Because you had questions about what you should do?

**Waddington:** That's fair, yes.

**Q:** Because you didn't have a controlled substance at that time?

**Waddington:** At that time nothing yielded positive.

**Q:** *And, in fact, you asked your superiors, "What are your thoughts if they come out and it doesn't yield a positive?"*

**Waddington:** It's possible I stated that, yes.

**Q:** Well, did you or didn't you?

**Waddington:** I don't remember stating that off the top of my head, but it's definitely possible. If it's in the video, then I stated it.

**Q:** Because that was a question that you had there, right?

**Waddington:** That's fair.

**Q:** Is that a yes or no?

**Waddington:** *Yes.*

**Q:** *And you asked your superior, "Do we need to talk to him at all"?*

**Waddington:** *I do remember stating that, I believe.*

**Q:** Okay. So, you were *unsure* of what to do in that situation with Mr. Boatright, whether you could hold him at all?

**Waddington:** I have to run everything through my supervisors prior to releasing them, *yes.*

. . .

**Q:** Well, you're having questions and you're calling in your boss to try to figure out what it is you can do, right?

**Waddington:** I feel more comfortable if I would have asked my supervisor, yes.

**Q:** Okay. Well, I'm glad you did, but you were outside your level of expertise in that situation?

**Waddington:** *After it yielding not positive, I was concerned, yes.*

**Q:** But, despite that, you -- and you had already taken Mr. Boatright and put him in your vehicle and put him in handcuffs at that time?

**Waddington:** I don't believe I put him into my vehicle at that time; however, he was handcuffed in front of his person, yes.

**Q:** Okay. And despite the negative results from the search, you took Mr. Boatright and his vehicle and you took it off the road that day, right?

**Waddington:** That's correct, yes.

**Q:** And you took it to Fairview Heights?

**Waddington:** Yes.

**Q:** Despite that, you *weren't sure* that you could do that?

**Waddington:** I wanted to get a supervisor's thoughts.

**Q:** Because you were *unsure* of what to do?

**Waddington:** *In a sense, yes.*

(Doc. 44, pp. 70-71) (emphasis added).

Regarding officer safety, Waddington and others were only worried about exposure to drugs—and thus wanted Narcan to be at the scene. (*Id*. at 0:38:50-0:40:00). But this danger did not stop them from searching the entire vehicle—even getting down on their knees to search the Lexus's floorboards and search under the trunk's floormats. Accordingly, the Court finds that the additional search in Fairview Heights was unreasonable because law enforcement was neither concerned about conducting a more thorough search for hidden contraband nor safety during the search on the side of the road.

###### C. *Other Exceptions to the Warrant Requirement?*

Law enforcement can conduct multiple searches in certain situations, but this is not one of them. In *United States v. Pace*, 898 F.2d 1218, 1242 (7th Cir. 1990), "the police searched the cars and some of the cars' contents several times." The Court explained:

> [T]he police searched [defendant's] car in the condominium parking lot before transporting the car to the police station. During the search, the police found a record book and a personal address book, which they paged through and determined were drug record books. The police also searched [the] [other] [defendant's] car at the police station, and found several receipts that indicated [other] [defendant] had been in Georgia and Indiana a few days earlier. A few days later, the police searched [the] [other] [defendant's] car again and found a secret compartment that turned out to contain traces of cocaine.

*Id*.

Both defendants challenged that these searches violated the Fourth Amendment. The Court held that the "search of [defendant's] car, the initial search of [the] [other] [defendant's] car, and the initial examinations of the record books and receipts were justified as legal inventory searches." *Id*. at 1243. But the Court did not find that the second search of the other defendant's car was constitutional under the automobile exception. *Id*. at 1244-45. Instead, the Court upheld the second search based on the notion that officers are authorized to conduct a "warrantless investigative search of a car based solely on the fact that the car is subject to seizure under a forfeiture statute." *Id*. at 1244. Unlike in *Pace*, the Government does not argue that the second search was based on validly seizing the Lexus or any other exception to the warrant requirement.

In *United States v. Rivera*, 825 F.2d 152 (7th Cir. 1987), law enforcement seized the defendant's vehicle and drove it to a DEA garage. *Id*. at 155. Law enforcement then called for a drug-sniffing dog, "which 'alerted' to the trunk area of the car." *Id*. Law enforcement searched the car and found cocaine in the trunk. *Id*. Three days later, law enforcement "conducted a more thorough search of the [car], retrieving nine additional packages of cocaine." *Id*. The Court found the second search reasonable, but it was based on additional probable cause. *See id*. at 158 (noting that "[a]fter receiving a tip that a more intense search of the car could yield more contraband, another 'sniff-test' was conducted, and the body of the car was subsequently searched"). The Court acknowledged that "[t]he second search was initiated once agents received a tip and a dog had alerted at the car (after the cocaine in the trunk had been removed)." *Id*. Here, unlike *Rivera*, law enforcement lacked the additional probable cause to conduct the second search.

There are additional cases where multiple searches occur, but the officers conducted the additional searches after finding drugs during the first search. *See e.g.*, *United States v. McGuire*, 957 F.2d 310, 313-314 (7th Cir. 1992) (officer discovered defendant was transporting open, alcoholic liquor, so he searched under the passenger side, found marijuana, and arrested defendants—then he did another search and found cocaine);[10] *United States v. Thornton*, 197 F.3d 241, 247 (7th Cir. 1999) (officer discovered cocaine in plain view, so he arrested the defendant and passenger, searched, and found a "bionic ear" and a briefcase to hold in place a machine pistol—and "[with] [h]is suspicions by now thoroughly aroused, [the] [officer] searched the interior of the Buick Regal more carefully and uncovered two hidden compartments that contained 2 loaded semi-automatic pistols and 13 additional 1–kilogram packages of cocaine"). Here, the officers' first search did not find drugs.

For these reasons, the Court finds that law enforcement's warrantless search of the Lexus in Fairview Heights violated the Fourth Amendment.

## IV.  Probable Cause to Arrest Boatright and Seize the Vehicle to Conduct a Second Search[11]

"Probable cause for an arrest exists if an officer reasonably believes, in light of the facts and circumstances within his knowledge at the time of the arrest, that the suspect has committed, or is committing, an offense." *Thompson v. Wagner*, 319 F.3d 931, 934 (7th Cir. 2003). Courts "must 'examine the events leading up to the arrest' and then determine 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *United States v. Eymann*, 962 F.3d 273, 286–87 (7th Cir.

---

[10]  In *McGuire*, the Court also noted that search of the trunk was further authorized under the "inventory search" exception to the warrant requirement. *Id*. at 314.

[11]  The Government does not address whether Waddington had probable cause to arrest Boatright.

2020) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

After considering the evidence presented, the Court concludes Waddington lacked probable cause to arrest Boatright and seize the Lexus. Besides the facts discussed above, the following testimony by Waddington confirms that he lacked objective facts to reasonably believe that Boatright had committed or was committing an offense:

> **Q:** *And as a result of your probable cause search, you were unsure of whether or not you could arrest Mr. Boatright?*
>
> **Waddington:** I can always take the vehicle off the road for a more thorough and safe search, which we have done in the past numerous times.
>
> **Q:** Did you arrest Mr. Boatright before taking him to Fairview Heights?
>
> **Waddington:** He was not free to leave at that time.
>
> **Q:** Did you place him under arrest?
>
> **Waddington:** I placed him in handcuffs, yes.
>
> **Q:** On the basis of what? What charge were you going to charge him with?
>
> **Waddington:** At that time we were going to further investigate where we had more resources readily available.
>
> **Q:** Okay. But he wasn't free to leave?
>
> **Waddington:** That's correct.
>
> . . .
>
> **Q:** Okay. But you had no charges at that point in time?
>
> **Waddington:** No, the investigation was still in the process.
>
> **Q:** Okay. You were booking him and arresting him, but you had no charges?
>
> **Waddington:** At that time we were in the process of the booking process, yes, sir.
>
> **Q:** For what?

**Waddington:** Possession of a controlled substance at that time.

**Q:** You had no controlled substance at that time?

**Waddington:** It was in the booking process by two other task force officers, yes, sir.

**Q:** You hadn't torn the car apart and found the cocaine in the vehicle when you had -- before you arrested him?

**Waddington:** We had not found the cocaine yet, no, sir.

**Q:** Okay. What were the charges? What was the controlled substance? Were you guessing?

**Waddington:** At that time we believed it to be a possible controlled substance, so we were in the process of doing that. However, did we send off for that charge at that time? No, we did not. We can still do the process without putting the charges in at that time.

**Q:** There are things you can do and things you ought to do. *You arrested this gentleman and you had no objective facts to charge him with any offense at that time.*

**Waddington:** At that time we gathered the DNA and the booking process, *that is correct*.

**Q:** *You had no objective facts to charge him with any offense, but yet you arrested him, correct?*

**Waddington:** *That's correct.*

**Q:** What were you going to put in the line for the controlled substance? What was it going to be?

**Waddington:** At that time I was not the DNA arresting officer, so I'm not sure what the charge –

**Q:** You were the arresting officer.

**Waddington:** That's correct.

**Q:** You had to fill out some paperwork. What were you going to fill out?

**Waddington:** I did not complete the DNA booking form.

**Q:** *You guys were just operating by the seat of your pants at that point in time, because you didn't know what you had, right?*

**Waddington:** *At that time we didn't know what we had, no.*

**Q:** But you didn't want to release him?

**Waddington:** No.

**Q:** *But you had no facts?*

**Waddington:** *We were still investigating what we possibly had.*

(*Id.* at pp. 72, 97-99) (emphasis added).

## V.      Suppression

Boatright asks the Court to suppress all evidence seized and statements subsequently made as a result of the traffic stop. The Supreme Court has directed that "all evidence obtained by an unconstitutional search and seizure [is] inadmissible in a federal court regardless of its source." *Mapp v. Ohio*, 367 U.S. 643, 654 (1951). This exclusionary rule is supplemented by the "fruit of the poisonous tree" doctrine, which bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1962). "If a search or seizure violates the Fourth Amendment, courts will exclude evidence gained from that violation in judicial proceedings against the person injured." *Rodriguez-Escalera*, 884 F.3d at 667.

The Court finds that all evidence and statements obtained as a result of the traffic stop on August 1, 2022, must be suppressed. *United States v. Swift*, 220 F.3d 502, 507 (7th Cir. 2000) ("Evidence which is obtained as a result of an illegal arrest is fruit of the poisonous tree and it must be excluded unless the government can show that it was obtained as a result not of the illegality, but rather 'by means sufficiently distinguishable to be purged of the primary

taint."). Again, Waddington lacked reasonable suspicion to stop the Lexus. Even if Waddington reasonably believed he saw a traffic violation, "the stop became illegal when law enforcement unlawfully extended the stop." (Doc. 32, p. 7). Finally, the additional search of the Lexus at Fairview Heights did not fall within one of the recognized exceptions to the warrant requirement.

CONCLUSION

For the reasons set forth above, the Court **GRANTS** Boatright's Motion to Suppress (Doc. 32) and **SUPPRESSES** all evidence obtained and statements subsequently made as a result of the traffic stop on August 1, 2022.

**IT IS SO ORDERED.**

**DATED:   June 20, 2023**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**